## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| MARK S. WALLACH, AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF PERFORMANCE TRANSPORTATION SERVICES, INC., on behalf of the estate and all others similarly situated,<br><br>               Plaintiff,<br><br>vs.<br><br>EATON CORPORATION, DAIMLER TRUCKS NORTH AMERICA LLC, FREIGHTLINER LLC, NAVISTAR INTERNATIONAL CORPORATION, INTERNATIONAL TRUCK AND ENGINE CORPORATION, PACCAR INC., KENWORTH TRUCK COMPANY, PETERBILT MOTORS COMPANY, VOLVO TRUCKS NORTH AMERICA, and MACK TRUCKS, INC.<br>               Defendants. | Civil Action No. _____<br><br><br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Mark S. Wallach, as Chapter 7 Trustee for the Bankruptcy Estate of Performance Transportation Services, Inc., on behalf of the estate and all others similarly situated, by and through its undersigned attorneys, brings this action under the antitrust laws of the United States for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. §14. This Complaint arises from Defendants' illegal and anticompetitive conduct in connection with the market for Class 8 truck transmissions in heavy duty trucks. The allegations herein are made on information and belief based on the investigation of Plaintiff's counsel.

## NATURE OF CLAIM

1.      Defendant Eaton Corporation ("Eaton") has long been the dominant supplier of manual transmissions to co-Defendants, original equipment manufacturers ("OEMs") of heavy duty trucks in the United States and throughout North America.  In 1989, Meritor Transmission Corporation ("Meritor") began selling heavy duty 9-speed manual transmissions in competition with Eaton.  Meritor was able to build its share of units sold to over 16% by 1999.

2.      In 1999, to improve its competitive position, Meritor entered into a joint venture with ZF Friedrichshafen AG ("ZF"), a European manufacturer of heavy duty transmissions. This joint venture company, ZF Meritor, used its expertise to develop and market the first fully automated, two-pedal manual transmission.  The successful launch of this transmission increased ZF Meritor's sales and positioned it to expand its transmission offerings to serve a wider variety of heavy duty truck applications.

3.      In response to ZF Meritor's success, Eaton, along with the OEMs – Daimler Trucks North America LLC, Volvo Trucks North America, Paccar Inc., and Navistar International Corporation – undertook a series of exclusionary actions designed to reduce customer access to ZF Meritor transmissions.  One action taken by Eaton and the OEMs was to enter into de facto exclusive dealing contracts, or Long Term Supply Agreements ("LTAs"), with Eaton.  These contracts assisted in foreclosing ZF Meritor from over 90% of the Class 8 truck transmission market.  As a result of the anticompetitive and exclusionary acts alleged herein, Meritor sued Eaton for violations of the antitrust law.  On October 30, 2009, following a seventeen-day trial, the jury returned a verdict against Eaton, finding that Eaton violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act by, *inter alia*, entering into the LTAs with the OEMs.

4.      In addition to implicating Eaton, the evidence at the trial of *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation*, Civil Action No. 06-623-SLR, United States District Court, District of Delaware,  ("Meritor-Eaton trial") implicated the OEMs as well. At trial, the jury heard substantial evidence that Eaton conspired with, and was substantially aided in the success of its anticompetitive scheme by, the OEMs. This evidence included proof that the OEMs benefitted monetarily from the LTAs, effectively sharing the monopoly rents that the LTAs, and the other exclusionary conduct alleged herein, enabled Eaton to continue to extract from the Class of purchasers of vehicles that contain Class 8 linehaul truck transmissions (as defined below).  Indeed, the jury specifically found that Eaton had conspired with the OEMs to unreasonably restrain trade, in violation of Section 1 of the Sherman Act.

5.      While Eaton and the OEMs materially aided each other through monetary and other support to accomplish the exclusion of Meritor, Plaintiff and the Class suffered harm from Defendants' scheme to foreclose competition in the Class 8 truck transmission market and its submarkets, as defined below.  The conduct of Defendants effectively eliminated competition for Class 8 linehaul truck transmissions, causing Plaintiff and the Class to pay supra-competitive prices for Class 8 linehaul truck transmissions, have less choice, and dampen innovation..

6.      As alleged herein, Defendants' unlawful contracts and other exclusionary acts have (a) unreasonably restrained trade in violation of Section 1 of the Sherman Act, and (b) increased, maintained, and/or extended Eaton's monopoly power in the United States market for Class 8 truck transmissions and its submarkets (including the market for linehaul truck transmissions), in violation of Section 2 of the Sherman Act and Section 3 of the Clayton Act.

7.     As a direct result of the reduction in competition in the Class 8 truck transmissions market and its submarkets caused by Defendants' violations of the antitrust laws, Plaintiff and members of the Class were caused to overpay substantially for vehicles that contain Class 8 linehaul transmissions throughout the Class Period, as alleged below. Defendants' conduct also harmed the Class, and competition, by reducing consumer choice and the incentives for innovation in heavy duty truck transmissions.

## JURISDICTION AND VENUE

8.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. §§14.

9.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question), 28 U.S.C. §1337(a) (commerce and antitrust regulation), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

10.     Venue in this District is proper pursuant to 28 U.S.C. §1391(b)-(c) and Section 12 of the Clayton Act, 15 U.S.C. §22, in that Defendants transact business, and can be found, in this District, and some of the Defendants reside, or are incorporated, here.

11.     Eaton, on its own and through the OEMs, sells, markets, and distributes Class 8 truck transmissions throughout United States, including this District, and delivers them across state lines.  The OEMs also sell, market, and distribute Class 8 heavy duty trucks throughout the United States, including this District, and deliver them across state lines.  Defendants are engaged in, and their activities substantially affect, interstate commerce.

## THE PARTIES

12.     Plaintiff Mark S. Wallach is Chapter 7 Trustee for the Bankruptcy Estate of Performance Transportation Services, Inc., which consists of Performance Logistics Group, Inc. ("PLG") and its subsidiaries: Performance Transportation Services, Inc.; Automotive Logistics

Corp.; Vehicle Logistics Associates, L.L.C.; Logistics Computer Services, Inc.; Hadley Computer Services; PLG Leasing Corp.; HFS Investments, Inc.; Florida Leasco Company, L.L.C.; Hadley Auto Transport, LLC; E. & L. Transport Company, L.L.C.; LAC Holding, LLC; Transportation Releasing L.L.C.; and Leaseway Motorcar Transport Company LLC.[1] Performance Transportation Services, Inc. was the main operating company for PLG, with its corporate headquarters in Allen Park, Michigan. For the purposes of this complaint, the bankruptcy estate consisting of Performance Transportation Services, Inc., PLG and its subsidiaries are collectively referred to as "PTS." Prior to seeking bankruptcy protection in November of 2007, PTS's primary business was providing delivery services to automobile manufacturers for the transport of new vehicles from manufacturing facilities to retail dealerships throughout the United States, certain parts of Canada, and Puerto Rico. As of the filing of its petition for bankruptcy, PTS was the second largest transporter of new automobiles, sport utility vehicles, and light trucks in North America. PTS delivered approximately 2.7 million new cars and light trucks annually using a fleet of Class 8 heavy duty trucks. During the Class Period, PTS purchased Class 8 heavy duty trucks with Class 8 truck transmissions from one or more Defendants. As a result of these purchases, PTS sustained injury and was damaged by reason of the antitrust violations alleged in this Complaint.

13.     Defendant Eaton Corporation is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Troy, Michigan. During all relevant times, Eaton manufactured, sold and marketed Class 8 truck transmissions in the United States market.

---

[1] *See* Order Granting Motion to Substantive Consolidation of Chapter 7 Cases, 1-07-bk-04746-MJK, U.S. Bankruptcy Court, Western District of New York, Document 1532, April 17, 2009.

14.     Defendant Daimler Trucks North America LLC ("Daimler Trucks") is organized and exists under the laws of the State of Delaware, with its principal place of business in Portland, Oregon.  During all relevant times, Daimler Trucks produced and marketed Class 8 heavy duty trucks in the United States market under the Freightliner, Sterling Trucks, and Western Star Trucks nameplates.

15.     Defendant Freightliner LLC ("Freightliner") is organized and exists under the laws of the State of Delaware, with its principal place of business in Portland, Oregon.  During all relevant times, Freightliner produced and marketed Class 8 heavy duty trucks in the United States market under its own nameplate and also under the nameplates of its subsidiaries, Sterling Trucks ("Sterling") and Western Star Trucks ("Western Star").

16.     Defendant Navistar International Corporation ("Navistar") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Warrenville, Illinois.  During all relevant times, Navistar manufactured and marketed Class 8 heavy duty trucks in the United States market under the nameplate of its subsidiary, International Truck and Engine Corporation.

17.     Defendant International Truck and Engine Corporation ("International") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Warrenville, Illinois.  During all relevant times, International manufactured and marketed Class 8 heavy duty trucks in the United States market.

18.     Defendant Paccar, Inc. ("Paccar") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Bellevue, Washington. During all relevant times, Paccar designed, developed, manufactured, and distributed Class 8 heavy duty trucks in the United States market under the Kenworth and Peterbilt nameplates.

19.     Defendant Kenworth Truck Company ("Kenworth") is a subsidiary of Paccar and is organized and exists under the laws of the State of Ohio, with its principal place of business in Kirkland, Washington.   During all relevant times, Kenworth manufactured and marketed Class 8 heavy duty trucks in the United States market.

20.     Defendant Peterbilt Motors Company ("Peterbilt") is a subsidiary of Paccar, with its principal place of business in Denton, Texas.   During all relevant times, Peterbilt manufactured and marketed Class 8 heavy duty trucks in the United States market.

21.     Defendant Volvo Trucks North America ("Volvo Trucks") is organized and exists under the laws of the State of Idaho, with its principal place of business in Greensboro, North Carolina.   During all relevant times, Volvo Trucks produced and marketed Class 8 heavy duty trucks in the United States market under the Volvo and Mack nameplates (collectively, "Volvo/Mack").

22.      Defendant Mack Trucks, Inc. ("Mack") is organized and exists under the laws of the State of Pennsylvania, with its principal place of business in Greensboro, North Carolina. During all relevant times, Mack produced and marketed Class 8 heavy duty trucks in the United States market.

23.     On information and belief, other partnerships, corporations, or business entities, unknown to Plaintiffs, are co-conspirators with Defendants in their unlawful restraint of trade. These other co-conspirators have facilitated, adhered to, participated in, and/or communicated with Defendants or others regarding the conspiracy.

24.     Defendants' anticompetitive activities were within the flow of, and had a proximate, direct, substantial, and reasonably foreseeable effect on, interstate commerce.   At all material times, Defendants engaged in business across state lines and charged higher prices to

Plaintiff and members of the Class across state lines, in a continuous and uninterrupted flow of interstate commerce throughout the United States.

**TRADE AND COMMERCE / BACKGROUND**

25.    A transmission or gearbox sends power from a vehicle's engine to its drive wheels.  When equipped with the proper transmission, the engine produces sufficient torque (i.e., the force used to turn the engine crankshaft) to accelerate and maintain a vehicle's speed. Torque is measured in pound-feet ("lb-ft"), and a transmission's capacity to accommodate torque is referred to as its torque rating.

26.    Transmissions use various gear ratios (called "gears" or "speeds") to manage the torque and speed of the vehicle.  The number of gears and gearing characteristics vary by vehicle and engine type.

27.    The switching of gears may be performed manually (by the operator) or automatically, depending on the type of transmission.  To change gears using a conventional stick-shift manual transmission, the driver typically must depress the clutch and move a shift lever to the desired gear.  In a vehicle with a conventional automatic transmission, the driver of the vehicle does not have to change gears; the transmission uses hydraulics to select the gears. A vehicle with a conventional manual transmission has three pedals (accelerator, brake, and clutch), while a vehicle with a conventional automatic transmission has two pedals (accelerator and brake).

28.    "Automatic manuals" are manual transmissions with clutches that have been automated with actuators and electronic controls to perform operations normally performed by the driver.  A fully automated manual transmission has two pedals (accelerator and brake) and an electronically controlled clutch.  The driver can drive in either automated or manual mode.

In manual mode, the driver uses a stick shift to initiate shifts between speeds, and the computer operates the clutch or controls the engine to allow for clutchless gear-shifting.

29.     There are eight recognized classes of vehicles, which employ different transmissions.  Class 8 vehicles are the heaviest, weighing 33,001 pounds or more.  Unlike Class 8 truck transmissions, the transmissions used in Class 1 to Class 7 vehicles are not built to withstand the high torque generated by the diesel engines that power heavy duty trucks.

30.     In fiscal year 2005, manufacturers sold over 325,000 Class 8 truck transmissions, and revenues from these sales exceeded $1 billion.

31.     Based on sales of all Class 8 truck transmissions, Eaton has at least 90% of the market.  The other Class 8 truck transmission manufacturers for the United States market are Allison Transmission (a division of General Motors) and Volvo/Mack, which produces transmissions for its own line of trucks.

32.     Because Class 8 vehicles are used for a variety of different applications, there are substantial variations in Class 8 truck transmissions.  In choosing the correct transmission for a particular application, truck purchasers and operators consider factors such as the kind of transmission (manual versus automatic), the number of gears, the torque rating, and gear traits. If a Class 8 transmission is not properly matched to the Class 8 vehicle in which it is installed and the application for which the vehicle is intended to be used, the vehicle's overall value, measured by performance, efficiency, maintenance costs, and other factors, will diminish.

33.     Class 8 truck transmissions for vehicles used in materially different applications are not good substitutes for one another.  Class 8 truck transmissions can be divided into three product categories: linehaul, vocational, and specialty.   Purchasers of Class 8 truck

transmissions well-suited for a particular vehicle (i.e., linehaul, vocational, or specialty) are unlikely to substitute a transmission intended for a different vehicle type.

34.     Approximately 70% of Class 8 truck transmissions are used in the linehaul market.  Class 8 truck transmissions used for linehaul applications ("linehaul transmissions") are found in heavy duty trucks designed to carry freight long distances (at least 30 miles between stops), travel 60,000 miles or more a year, and operate mostly on highways or other paved surfaces.  Linehaul trucks are used to haul, among others, box trailers, curtain siders, refrigerated trailers, tankers, flat beds, lowboys and car-carrying trailers.  Linehaul trucks have historically used manual 9- and 10-speed transmissions with an accelerator, brake, and clutch pedal and torque ratings generally ranging from 1,450 lb-ft to 1,650 lb-ft.  More recently, automated manual transmissions with torque ratings similar to 9- and 10-speed manual transmissions have become more popular with linehaul operators. In response to a small but significant, other-than-temporary increase in price from a competitive level, substitution by purchasers of linehaul transmissions to other products would not be significant.

35.     Eaton has had monopoly power in the linehaul transmission market throughout the Class Period and its current market share in this market is upwards of 90%.  Although Meritor once held a share of roughly 22% of this market, that share dwindled to around 4% in 2006.  Meritor now markets only a small number of automated manuals and exited the manual transmission market in 2007.

36.     About 26% of Class 8 truck transmissions are used in the vocational market. Class 8 truck transmissions used for vocational applications ("vocational transmissions") are found in heavy duty trucks operating in rugged performance environments.  For purposes of this Complaint, vocational transmissions include: (a) extreme–duty, 13- and 18-speed

transmissions, with  torque ratings typically ranging from 1,650 lb-ft to 1,850 lb-ft but sometimes exceeding 2,000 lb-ft; and (b) on- and off-road "Low-Low" and 15-speed transmissions, with gearing designed to provide efficient cruising and creeping (i.e., extremely slow) speed versatility.  Vocational transmissions with high torque ratings are often used in heavy duty trucks transporting equipment or materials weighing more than 140,000 pounds. Vocational Low-Low and similar transmissions are predominately found in heavy duty construction vehicles, which need great versatility to operate in on- and off-road environments. Vocational transmissions are priced at a substantial premium above manual linehaul transmissions, generally at prices 10% to 45% higher, with price differentials becoming more pronounced in higher torque-rated transmissions.  In response to a small but significant, other-than-temporary increase in price from a competitive level, substitution by purchasers of vocational transmissions to other products would not be significant.

37.    Eaton has had monopoly power in the vocational transmission market through out the Class Period, and currently possesses upwards of 90% of this market.  As a practical matter, Eaton is the only external manufacturer and supplier of vocational transmissions in North America.  Volvo/Mack produces transmissions solely for use on vehicles it manufactures for vocational purposes.

38.    The remainder of Class 8 truck transmissions, about 4%, are sold in the specialty transmission market.  Class 8 truck transmissions used for specialty applications ("specialty transmissions") are primarily used in "stop and start" vehicles, such as garbage, fire, and delivery trucks.  Nearly all specialty transmissions are automatic transmissions.  The torque ratings for specialty transmissions are generally less than 1,500 lb-ft.  Unlike tractor trailers, most heavy vehicles containing specialty transmissions are straight trucks (i.e., the cab, chassis,

and body comprise a single unit).  Generally, customers pay three-to-five times more for a specialty automatic transmission than they would for a comparable manual or automated manual transmission.  In response to a small but significant, other-than-temporary increase in price from a competitive level, substitution by purchasers of specialty transmissions to other products would not be significant.

39.     OEMs of heavy duty trucks incorporate Class 8 truck transmissions into the heavy duty trucks purchased by consumers.   There are four OEMs (together with their controlled subsidiaries or divisions): Daimler Trucks, Volvo Trucks, Paccar, and Navistar.

40.     The OEMs manufacture and sell Class 8 trucks through dealers, and, on occasion, directly to large truck fleet operators, such as PTS.  Dealers sell to fleets and owner operators.   In most instances, truck buyers specify the brand of transmission and other components to be used in the Class 8 trucks they purchase.

41.     When selecting components for a new truck purchase, truck buyers refer to OEM product data books or online ordering software, which list an OEM's component offerings, including transmissions.  For each component, one brand will be listed as "standard," while others may be listed as optional.  Optional transmissions are usually priced at a mark-up above the price of the standard transmission.  The standard transmission is considered to be the OEM's preferred choice.   Truck buyers are more likely to purchase the OEM's standard component.

42.     When a transmission is not listed as an option – i.e., it is excluded from the data book – the manufacturer's ability to sell the transmission is severely diminished, if not completely eliminated.  The unlisted transmission, if available at all, is always priced with an up-charge.

43.     In addition to using data book position to increase demand for its transmissions, a manufacturer may try to "pull-through" downstream sales by enticing the truck buyer to order a particular transmission from an OEM.  Pull-through devices include monetary incentives such as discounts or competitive equalization payments (i.e., payments to customers to meet a competitor's price or "equalize" the price), as well as non-monetary incentives such as demonstrations of product superiority and value.   When a manufacturer's transmission is excluded from the data book, is priced with an up-charge, or otherwise placed at a disadvantage, pull-through marketing becomes considerably more costly and far less effective.

44.     The barriers to entry into the Class 8 truck transmission market are high. Entrants and existing competitors face high sunk and fixed costs to bring competitive products to market.   They have little to no ability to license the intellectual property needed for transmission design and development, and have to spend substantial amounts of money to validate the reliability and other attributes of their products, which can take upwards of a year or more.   They would also have to make intensive and sustained investments in transmission marketing, warranty programs, demonstrations, sales, and service if they hope to persuade customers to purchase or switch to their transmissions.   Finally, entrants would need sustained sales of transmissions in order to earn enough share of the market to be able to recoup these substantial entry costs.

45.     The agreement between Eaton and the OEMs ensures that Eaton has more than 90% share in this market, and virtually guarantees that an entrant will never be able to gain sufficient market share to support entry into the Class 8 truck transmission market.   This is evidenced by the fact that, despite the existence of significant competition in markets all over the world, the United States market has had only one entrant, Meritor, in the last 29 years.   And

as the evidence in the Meritor-Eaton trial showed, Meritor lost significant share in the United States market and had to shutter its operations because of the conspiracy to monopolize and foreclose entry into this market that was carried out by Eaton and the OEMs.

## FACTS

46.     Beginning with its purchase of the Fuller Manufacturing Company in 1958, Eaton has been the dominant and most widely known heavy duty manual transmission manufacturer in North America.

47.     By the late 1980s, Eaton held at least an 80% market share and the standard position in the data books for nearly every truck model at each of the OEMs in the markets for linehaul and vocational transmissions.  It has described itself as "solidly entrenched" in the marketplace.

48.     In 1989, in response to customer demand for greater transmission choice and the opportunity to complement its other drive train component offerings, Meritor (through its predecessor, Rockwell International Corporation), began to manufacture and sell linehaul transmissions.

49.     Meritor started out supplying 9- and 10-speed manual transmissions for linehaul trucks.  By 1992, Meritor was able to gain roughly 14% of sales in the linehaul market.  Meritor achieved additional growth after it obtained standard position on certain Freightliner truck models and availability in data books at all the OEMs.

50.     In 1996, to meet consumer demand for manual transmission automation, Meritor developed an engine synchronized shift ("ESS") system, which automatically synchronized engine revolutions to road speed.  The innovation made manual shifting easier, essentially eliminating the need to use the clutch except for stopping and starting.  In the same period,

Eaton offered some transmission automation through its Top-2 and AutoSelect products. The Eaton and Meritor technologies represented the first generation of Class 8 truck transmission automation in North America. Meritor's introduction of ESS benefited consumers by, among other things, bringing competition to these automated products.

51.     By 1999, Meritor's share of the linehaul market had surpassed 20%. In an attempt to further enhance its position in the market, Meritor entered into the joint venture with ZF to form ZF Meritor in June 1999. Meritor and ZF each had a 50% interest in the venture, including the venture's profits and losses.

52.     ZF brought to the venture its expertise in transmission technology. ZF's product line in Europe included automatics and fully automated manual heavy duty transmissions. No single manufacturer offered such a range of products in North America. The combination of ZF's and Meritor's marketing and service teams, distribution and manufacturing capabilities, and North American presence created a formidable competitor.

53.     In August 1999, building upon Meritor's relationship with Freightliner, ZF Meritor entered into a non-exclusive, short term supply agreement with Freightliner, the largest Class 8 truck OEM. At Freightliner, ZF Meritor secured standard position on, among other models, Freightliner's Class 8 Century and Sterling's Aeromax truck models. The agreement did not require Freightliner to remove Eaton transmissions from the Freightliner data book or charge customers a price penalty for selecting optional Eaton transmissions. The agreement was to run through 2001 and could be extended by the parties. ZF Meritor expected to achieve a high volume of transmission sales on Freightliner trucks.

54.     At the other OEMs, ZF Meritor transmissions were listed in the data books as a competitively priced option.

55.     In November 1999, ZF Meritor further advanced its competitive position by introducing North America's first two-pedal, fully automated manual Class 8 truck transmission, the "FreedomLine." Based on ZF's Astronic automated manual transmission, the FreedomLine beat Eaton's two-pedal offering (the UltraShift) to market release by nearly three years.

56.     The FreedomLine met with overwhelming positive feedback from the industry and customers. In 2000, the Truck Writers of North America awarded FreedomLine the Technical Achievement Award, given annually to the truck component that "best exemplifies engineering excellence and broad practicality for use in the trucking industry."

57.     The FreedomLine represented the third generation in automated transmission technology for Class 8 trucks in North America. First- and second-generation technology required the use of a manual clutch, thereby necessitating a three-pedal configuration. The FreedomLine did not require a clutch pedal; it operated with only accelerator and brake pedals.

58.     The superior efficiencies and value of the third-generation technology were numerous, ranging from improved fuel economy to enhanced driver safety, instruction, and retention, to less drive train wear, a quieter ride, and higher resale values.

59.     ZF Meritor's release of the FreedomLine put Eaton's dominant market position at risk. Eaton did not have a two-pedal offering, and predictions in the heavy duty truck industry were that automated manual transmissions, including third-generation technology, would gain significant share among Class 8 truck transmission users. Automated manual transmissions did, in fact, gain significant market share; by 2005, share had reached 12% to 15%, with Eaton predicting additional growth of 1% to 2% per year.

60.     The emergence of ZF Meritor, with its standard position at Freightliner, its optional, competitively priced position at other OEMs, its existing customer base upon which to build, and its introduction of the FreedomLine transmission (particularly in the absence of a two-pedal Eaton transmission) created a substantial competitive threat to Eaton's market dominance.  Eaton and the OEMs responded with exclusionary conduct, designed to eliminate competition; once and for all drive Meritor and affiliated entities out of the linehaul market, and block any attempts by Meritor to enter the vocational market.

61.     To preserve and increase its market dominance, Eaton entered into de facto exclusive contracts, or LTAs, with each of the four OEMs, including, in some instances, expanding or extending prior supply agreements with provisions designed to foreclose competition.  The OEMs knew that if they agreed to make Eaton their exclusive supplier, there would be no room in the linehaul and vocational markets for ZF Meritor.

62.     The LTAs contained lucrative bundled rebate and share penetration incentives that the OEMs could achieve only by diverting purchasers of ZF Meritor transmissions to Eaton transmissions.  The OEMs agreed to exclude ZF Meritor transmissions from the OEMs' sales materials and/or to penalize customers with higher prices or other punitive measures if those customers selected ZF Meritor transmissions over Eaton transmissions.  Eaton's agreement with the OEMs caused the OEMs to refuse to offer ZF Meritor transmissions or dissuade customers from purchasing them, despite customer demand.  Ultimately, the agreement between Eaton and the OEMs to foreclose ZF Meritor from the market caused ZF Meritor to have access to less than 10% of the linehaul market and no access to the vocational market.

63.     The OEMs were rewarded by Eaton for excluding Meritor by sharing in the illicit monopoly rents that Eaton was able to extract from the Class, including, but not limited

to, payments in the form of bundled loyalty rebates.  Since all of the OEMs entered into LTAs with Eaton, the OEMs were assured that they would not be operating at a disadvantage to each other for Eaton transmissions.  Instead, the Class bore the harm in the form of supracompetitive prices resulting from the diminution in competition.

**Exclusion of ZF Meritor at Freightliner**

64.     Eaton was able to dislodge ZF Meritor's supply agreement with Freightliner by, among other acts, guaranteeing Freightliner millions in annual rebates and other incentives if Freightliner purchased at least 92% of its total linehaul and vocational transmission needs from Eaton.  Freightliner's rebate package included sizeable rebates on Eaton's vocational, premium-priced transmissions (e.g., 13- and 18-speed transmissions), for which Eaton was the sole manufacturer.  Unless it qualified for the rebates, Freightliner would pay substantially more for these transmissions.  Given its mix of vocational and linehaul transmission needs, Freightliner would have to purchase Eaton 9- and 10-speed transmissions to the exclusion of ZF Meritor's competing transmissions in order to achieve 92% penetration.  Thus, Eaton linked rebates on vocational transmissions for which it faced no meaningful competition (including vocational transmissions critical to Freightliner's subsidiary, Sterling) to Freightliner's purchase of linehaul transmissions for which Eaton faced competition from ZF Meritor.

65.     Eaton also demanded, and Freightliner agreed, that Freightliner would replace ZF Meritor with Eaton as the standard position in Freightliner's data book.  Further, Eaton demanded, and Freightliner agreed, that ZF Meritor's transmissions would initially be listed at a penalty in the Freightliner data book (i.e., at prices above comparable Eaton transmissions) and would be excluded from the data book altogether beginning in late 2001 or early 2002.  Freightliner agreed to this even though it had initially expressed reservations that the exclusive

listing of Eaton transmissions would increase the cost of processing and administering orders for unpublished transmissions.

66.     ZF Meritor attempted to save its Freightliner business by offering discounts and other incentives on its linehaul transmissions.   Moreover, in 2000 and 2002, Freightliner awarded ZF Meritor its Master of Quality Award.   No Eaton facility received a similar award from Freightliner.   Nevertheless, ZF Meritor could not persuade Freightliner to offer its transmissions.

67.     Eaton and Freightliner consummated their new relationship effective November 1, 2000.   The purpose and effect of the Eaton/Freightliner contract, through the use of penetration incentives, bundled rebates, and Eaton's demand for standard position and displacement of ZF Meritor transmissions, was to ensure that Eaton secured all, or virtually all, of Freightliner's transmission business, to ZF Meritor's exclusion.   Further, to assure that ZF Meritor would starve in the market, in July 2003, Eaton and Freightliner amended their 2000 LTA for the third time.   The amendment extended the LTA through 2010 and added a sliding scale rebate formula that do not allow for rebates if Eaton's share of sales to Freightliner fall below a specified level.

68.     Freightliner's agreement with Eaton harmed competition and injured consumers. Among other things, removal of ZF Meritor transmissions from the Freightliner data book and the imposition of price penalties on ZF Meritor transmissions impaired consumer access to those products.   Freightliner benefited from the impaired consumer access, as Eaton allowed Freightliner to share in the monopoly rents that it was able to extract from the Class.

69.     As a direct and foreseeable result of the Eaton/Freightliner anticompetitive agreement and Defendants' other exclusionary acts, ZF Meritor's sales to Freightliner (and its

subsidiaries, Sterling and Western Star) declined substantially.  Shortly before consummation of the Eaton/Freightliner contract, for the fourth quarter of fiscal year 2000, ZF Meritor's penetration at Freightliner and Sterling stood at around 23% and 17%, respectively.  By the end of fiscal year 2005, Meritor's share of transmission sales to Freightliner and Sterling had fallen to roughly 4% and 3%, respectively.

**Exclusion of ZF Meritor at International**

70.    Eaton and International entered into a long-term de facto exclusive contract, or LTA, effective July 1, 2001.

71.    Under the contract, International would receive maximum incentives only after Eaton's combined linehaul and vocational sales penetration at International reached 87%, and possibly as high as 95%, by the last year of the agreement.  To obtain rebates on vocational transmissions for which Eaton faced no meaningful competition, International agreed under the LTA to purchase Eaton transmissions (mainly 9- and 10-speed manual transmissions), which competed directly with ZF Meritor's transmissions.  International also agreed to exclude ZF Meritor from its data book on new truck models and to prohibit International's Diamond Spec warranty from covering new truck models equipped with ZF Meritor, rather than Eaton, transmissions.  Further, International agreed to give Eaton standard position in International's Class 8 linehaul and vocational data books.

72.    In 2005, the original Eaton/International LTA expired, but during the negotiation of a new LTA, Eaton and International agreed to continue their relationship under the general guidelines of the previous agreement.  In February 2007, after an extended negotiation, Eaton and International entered into a new LTA.  The new agreement contractually obligated

International to remove the FreedomLine from its data book and exclusively market Eaton's automated manual transmissions.

73.     International's agreement with Eaton harmed competition and injured consumers.  Among other things, removal of ZF Meritor transmissions from the International data book and the imposition of price penalties on ZF Meritor transmissions impaired consumer access to those products.  International benefited from the impaired consumer access, as Eaton allowed International to share in the monopoly rents that it was able to extract from the market.

74.     As a direct and foreseeable result of the Eaton/International anticompetitive agreement, ZF Meritor's penetration at International declined.  Around the consummation of the Eaton/International contract, for the fourth quarter of fiscal year 2000, ZF Meritor's penetration at International was about 13%.  By the end of fiscal year 2005, Meritor's share of transmission sales to International had fallen to 2%.  As a result, for new International truck models, Meritor transmissions would not be engineered into the vehicle platform; the transmissions simply would not be available on those vehicles, even as an unpublished option.

**Exclusion of ZF Meritor at Paccar**

75.     While ZF Meritor, and Meritor before it, had enjoyed some success in selling to Paccar because of a pre-existing supply relationship, Eaton and Paccar modified and extended Eaton's supply agreement with Paccar to prevent ZF Meritor's growth at Paccar.  The July 1, 2000 LTA between Eaton and Paccar, a seven-year agreement, withheld maximum transmission rebates from Paccar unless Eaton's share of sales of linehaul and vocational transmissions (and other components) to Paccar reached 95%.  The FreedomLine was not excluded from Paccar's penetration calculation, but purchases of the FreedomLine would count against Paccar reaching its penetration goals, thereby decreasing its incentive to sell the new

technology. Dampening Paccar's purchases of the FreedomLine had a particularly negative effect on competition, since Paccar would be the first OEM (through Peterbilt) to release the FreedomLine to customers.

76.     In June 2007, with the Eaton/Paccar LTA nearing expiration, Eaton and Paccar agreed that their current business relationship as established by the LTA would continue after the expiration date on the same terms and conditions as the LTA.

77.     Paccar's agreement with Eaton harmed competition and injured consumers. Among other things, removal of ZF Meritor transmissions from Paccar's data book and the imposition of price penalties on ZF Meritor transmissions impaired consumer access to those products. Paccar benefited from the impaired consumer access, as Eaton allowed Paccar to share in the monopoly rents that it was able to extract from the Class.

78.     As a direct and foreseeable result of the Eaton/Paccar anticompetitive agreement, ZF Meritor's share of transmission sales at Paccar consistently languished around 5% and fell to less than 1% in fiscal year 2005. In 2005, Paccar's Peterbilt division announced that ZF Meritor/Meritor transmissions would no longer be available on new truck orders.

**Exclusion of ZF Meritor at Volvo/Mack**

79.     In the spring and summer of 2002, ZF Meritor attempted to form a commercial partnership with Volvo/Mack for the manufacture, marketing, and sale of linehaul and vocational transmissions. Such a partnership was a ZF Meritor priority given the agreement between Eaton and the other OEMs. ZF Meritor offered substantial price reductions, year-over-year cost downs (i.e., price decreases), and the opportunity for Volvo/Mack to obtain a full line of private brand transmissions, including vocational transmissions.

80.     Despite Meritor's attempts to enter into an agreement with Volvo/Mack, by October 1, 2002, Eaton and Volvo/Mack had entered into a long-term five-year contract, expiring, at the earliest, in September 2007.  The agreement contained linehaul and vocational transmission penetration incentives that withheld maximum rebates or price reductions from Volvo/Mack if ZF Meritor's sales reached 15% of Volvo/Mack's linehaul and vocational transmission purchases.  Eaton and Volvo/Mack further diminished ZF Meritor's opportunity for sales at Volvo/Mack by agreeing that Volvo/Mack would price ZF Meritor transmissions at a penalty to Eaton transmissions.  Eaton's transmission was also made standard on all of Volvo/Mack's Class 8 linehaul trucks and Volvo's Class 8 vocational vehicles.  Eaton and Volvo/Mack also agreed to exclude ZF Meritor transmissions from Volvo/Mack's data book.

81.     In late 2007, Eaton and Volvo/Mack agreed to a new LTA.  Like the 2002 LTA, the new agreement contained benefits triggered by share attainment and could become null and void if the specified share was not attained.

82.     Unlike other OEMs, Volvo/Mack actually manufactures their own line of Class 8 truck transmissions solely for their own product lines.  To ensure that Eaton continued its dominance, Volvo/Mack agreed to price their own transmissions at a premium to Eaton's transmissions.  Volvo/Mack transmissions, as a result of their agreement, actually lost market share to Eaton's transmission in the United States market.  Such conduct was in Volvo/Mack's economic interests only because of Volvo/Mack's agreement to promote and share the benefits of Eaton's monopoly.

83.     Volvo/Mack and Eaton's agreements harmed competition and injured consumers.  Among other things, the imposition of price penalties on ZF Meritor transmissions impaired consumer access to those products.  Volvo/Mack benefited from the impaired

consumer access, as Eaton allowed Volvo/Mack to share in the monopoly rents that it was able to extract from the Class.

84.     As a direct and foreseeable result of the anticompetitive agreement between Eaton and Volvo/Mack ZF Meritor's penetration at Volvo/Mack declined.   ZF Meritor's/Meritor's share of transmission sales to Volvo and Mack fell from an estimated 24% and 6%, respectively, in the fourth quarter of fiscal year 2002, around the time of the Eaton-Volvo/Mack transaction, to approximately 11% and 2%, respectively, by the end of fiscal year 2005.

**Defendants' Exclusion of Meritor**

85.     The agreements between Eaton and the OEMs were designed so that the OEMs would qualify for the rebates and thus share in the monopoly rents only if they diverted both current and future purchasers of ZF Meritor transmissions to Eaton transmissions.   The agreements between Defendants included having the OEMs:

(a)     eliminate ZF Meritor from data book listings;

(b)     reduce the residual values to be paid for trucks sold with ZF Meritor transmissions;

(c)     refuse to provide financing to customers that specified ZF Meritor transmissions;

(d)     inform customers that if they wanted delivery by specified dates, the customers would have to change orders from ZF Meritor transmissions to Eaton transmissions;

(e)     decline to hold build slots for truck buyers if they selected other than Eaton transmissions;

(f)     market Eaton's three-pedal automated manual transmission as essentially comparable to ZF Meritor's technologically superior two-pedal FreedomLine;

(g)     employ other than cost-based pricing penalties on ZF Meritor transmissions;

(h)     exclude ZF Meritor from warranty programs;

(i)     notify customers that ZF Meritor transmissions were not available, even though they were available; and

(j)     delay and disrupt the release and sales of Meritor's FreedomLine transmission.

86.     The agreements between Eaton and the OEMs obstructed ZF Meritor's pull-through marketing efforts and materially increased sales of Eaton transmissions, to the detriment of ZF Meritor, Plaintiff, and the Class.

87.     Defendants also used these and other exclusionary acts to obstruct Meritor's entry into the market for vocational transmissions.  Given the significance of economies of scale in production of Class 8 truck transmissions, and the substantial fixed and sunk costs associated with the research, development, and introduction of new transmission technology and products, Meritor required sales opportunities and ample investment or partnerships in order to enter into the vocational market.  Defendants' anticompetitive practices, however, deprived Meritor and ZF Meritor of all three.  Eaton and the OEMs entered into long-term, exclusive contracts covering linehaul and vocational transmissions that served to lock ZF Meritor out of the vocational market.  Eaton policed this agreement by threatening the OEMs with retaliatory price increases or patent litigation if the OEMs sold or licensed vocational transmission technology to Meritor or ZF Meritor.

88.    The conduct set forth above was part of Defendants' affirmative conduct in furtherance of the conspiracy to exclude ZF Meritor/Meritor and in violation of the antitrust laws.

**ZF Meritor is Forced From the Market**

89.    Defendants' anticompetitive conduct – including the LTAs between Eaton and the OEMs, the employment of bundled rebates, lucrative share penetration incentives, data book and other exclusions, and punitive pricing on Meritor and ZF Meritor transmissions – had the practical effect of precluding ZF Meritor from selling linehaul and vocational transmissions to the OEMs.  Freightliner, for example, simply told ZF Meritor that it could no longer do business with ZF Meritor because of the OEM's contract with Eaton.

90.    With its potential share of sales of linehaul and vocational transmissions to the OEMs limited to less than 10%, and no practical ability to increase its market share because of Defendants' exclusionary conduct, Meritor and ZF decided to dissolve the ZF Meritor joint venture.  Although ZF Meritor remains a legal entity, it no longer sells transmissions.

91.    Meritor nonetheless tried to remain a supplier of Class 8 truck transmissions to the OEMs, and became a sales agent for ZF to ensure continued customer access to the FreedomLine.  However, Defendants' continued anticompetitive conduct led to further declines in Meritor's sales.  By the end of fiscal year 2005, Meritor's share of transmissions sales at the four OEMs, including sales of the FreedomLine, had tumbled.  Meritor, other than marketing the FreedomLine, exited the manual transmission business in 2007.

92.    The foregoing anticompetitive conduct by Eaton and the OEMs, both individually and in concert with each other, has directly and proximately harmed competition by limiting consumer choice, eliminating competitive checks on pricing, suppressing

innovation, and foreclosing an efficient and significant competitor from the markets for Class 8 truck transmissions.  Defendants' acts have served to exclude Meritor and ZF Meritor from the market for linehaul transmissions, and Meritor and ZF Meritor have been deterred from undertaking investments in technology and products that would have threatened Eaton's monopoly in the market for vocational transmissions.  If Meritor and ZF Meritor had not been foreclosed, competition would have intensified, and purchasers would have benefited from lower prices for transmissions.  Instead, as a result of Defendants' anticompetitive conduct, purchasers have been monetarily penalized and excluded from warranty programs if they purchased Meritor or ZF Meritor transmissions, and have also been deprived of fair and timely access to ZF Meritor's advanced transmission technology, including, without limitation, Meritor's ESS transmission system and North America's first two-pedal, fully automated manual transmissions.

93.    The foregoing anticompetitive conduct by Defendants, both individually and in concert with each other, has caused antitrust injury to Plaintiff and the Class by, *inter alia*, foreclosing competition for Class 8 truck transmissions, inflating the prices of such transmissions, suppressing innovation, and foreclosing competitive choices.

94.    Prior to the signing of the LTAs with the OEMs, Eaton used payments and other monetary incentives to market their Class 8 truck transmissions to the Class.  These payments and incentives were paid by Eaton directly to Class Members and were competitive measures used by Eaton to combat Meritor's increasing market share.  However, once Eaton's conspiracy with the OEMs foreclosed Meritor from the market, Meritor was no longer a competitive threat. As a result, Eaton eliminated the payments and other incentives to the Class.  The result was a

direct impact on the Class as they were now paying inflated prices for the Class 8 truck transmissions.

95.     In contrast to the harm Defendants' conduct has caused Plaintiff, the Class, and Meritor/ZF Meritor, Eaton's truck business, which relies heavily on its United States transmission sales, has amassed record profits.  Since the start of the conspiracy, Eaton's operating profits from its North American truck business have increased from $90 million in 2002 with 181,000 Class 8 trucks sold, to a high of $ 453 million in 2005 with more than 250,000 Class 8 trucks sold, and most recently $315 million in 2008 with more than 133,000 Class 8 trucks sold.  At the same time, Eaton's operating margins have increased from 7.7% in 2002, to a high of 19.8% in 2005, and 14% in 2008.

96.     The foregoing anticompetitive conduct by Defendants, and the resultant injuries continue as Eaton and the OEMs still operate under existing or renewed de facto exclusive dealing contracts, and continue to engage in other conspiratorial behavior in furtherance of the conspiracy to foreclose competition in the market.

## CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the estate and the following Class:

> All persons or entities in the United States that purchased vehicles that contain Class 8 linehaul truck transmissions directly from Eaton or the OEMs (the "Class") beginning October 1, 2002 and continuing until the present (the "Class Period").  Specifically excluded from this Class are Defendants and their parent companies, subsidiaries, affiliates, officers, directors, employees, legal representatives, heirs or assigns, and co-conspirators.  Also excluded are any federal, state, or local governmental entities, any judicial officers presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

98.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.  While the exact number of Class members is

unknown to Plaintiff, it is believed to be in the thousands.  Furthermore, the Class is readily identifiable from information and records in Defendants' possession.

99.     Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.  Among those common questions of law or fact are:

(a)     whether Defendants conspired to restrain trade in, exclude competition in, and/or monopolize the markets for linehaul and vocational  Class 8  Transmissions;

(b)     whether Defendants conspired to unreasonably restrain trade and maintain prices for Class 8 truck transmissions sold in the United States at supracompetitive levels by foreclosing the sale of Meritor and ZF Meritor Class 8 truck transmissions in the United States market;

(c)     whether Defendants conspired to maintain and extend an unlawful monopoly;

(d)     the existence and duration of the illegal conduct  alleged herein;

(e)     whether Defendants concealed their unlawful activities;

(f)     whether Defendants' anticompetitive conduct resulted in diminished competition for Class 8 truck transmissions;

(g)     whether Defendants' anticompetitive conduct caused prices for Class 8 truck transmissions to be higher than they would have been in the absence of Defendants' conduct;

(h)     whether Defendants' conduct violates the Clayton and Sherman Acts;

(i)      whether Plaintiff and other Class members have sustained, or continue to sustain, damages as a result of Defendants' wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages;

(j)      whether Plaintiff and the other Class members are entitled to an award of compensatory treble damages, and, if so, in what amount; and

(k)      whether Plaintiff and the other Class members are entitled to equitable relief.

100.    Plaintiff is a member of the Class and Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants; i.e., they paid increased prices for Class 8 truck transmissions as a result of Defendants' wrongful conduct.

101.    Plaintiff will fairly and adequately protect the interests of other Class members because it has no interest that is antagonistic to, or that conflicts with, those of any other Class member.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature to represent Plaintiff and other members of the Class.

102.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

103.    Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby rendering injunctive or declaratory relief with respect to the Class as a whole appropriate.

104.     This class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will permit a large number of similarly situated persons or entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.  The damages sustained by individual Class members, although meaningful, do not rise to the level where it is economically rational to prosecute separate complex actions against these well-financed corporate Defendants.   The instant case will be eminently manageable as a class action.  Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## FRAUDULENT CONCEALMENT

105.     Plaintiff and the Class did not discover, and could not have discovered through the exercise of reasonable and due diligence, Defendants' anticompetitive and conspiratorial conduct alleged herein, or the existence of the causes of action alleged herein, at any time prior to October 5, 2006, when Meritor filed its competitor case against Eaton.

106.     Because Defendants did not disclose the existence or nature of their anticompetitive conduct to Plaintiff and the Class, Plaintiff and other Class members could not have reasonably become aware of Defendants' unlawful conduct alleged herein at any time prior to October 5, 2006.  Before that date, Plaintiff and the Class did not, and could not have with the exercise of reasonable diligence, become aware of the facts necessary to allege the causes of action alleged herein, including the fact that they were paying artificially high prices for Class 8 truck transmissions as a result of Defendants' conduct.

107.     Defendants' affirmative acts alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

108.    Defendants formally entered into the conspiracy by signing and agreeing to the terms of the LTAs.  In addition to their exclusive dealing language, the LTAs also contained confidentiality language that effectively concealed the conspiracy from Plaintiff and the Class.

109.    Defendants fraudulently concealed their participation in the conspiracy alleged herein by, *inter alia*, entering into de facto exclusive dealing contracts and then engaging in actions to ensure that the contracts succeeded in eliminating Meritor from the Class 8 truck transmissions market.   These actions included, without limitation, ensuring that Meritor transmissions did not appear in data books; falsely informing customers that Meritor transmissions were not available; and creating incentives related to financing, build dates and residual pricing that favored the use of Eaton transmissions over Meritor transmissions. Defendants' actions were self-concealing in that they pushed customers away from Meritor transmissions but never disclosed to the customers that their actions were part of a conspiracy to eliminate Meritor transmissions from the Class 8 truck transmissions market.

110.    Because of such fraudulent concealment and the inherently self-concealing nature of the actions forming this conspiracy, Plaintiff could not have discovered the existence of this conspiracy, and the causes of action alleged herein, until after the filing of Meritor's action against Eaton.

111.    Although Plaintiff exercised all reasonable and due diligence, Plaintiff had no knowledge of Defendants' unlawful self-concealing conspiracy, and could not have discovered Defendants' agreements and conspiracy, and the existence of the causes of action alleged herein, at any time prior to October 5, 2006 by the exercise of due diligence, because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection of, and fraudulently conceal, their agreements and conspiracy.

112.    None of the facts or information available to Plaintiff and the Class prior to October 5, 2006, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy and anticompetitive conduct alleged herein prior to October 5, 2006.

113.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff asserts the tolling of the applicable statute of limitations affecting Plaintiff's right of action.  In addition, Defendants' illegal conspiratorial conduct, as alleged above, continues to the present day, including the fact that Defendants continue to abide by the terms of the LTAs and ensure that Meritor transmissions do not appear in data books.

**Monopoly Power and Market Definition**

114.    At all relevant times, Eaton had monopoly and/or market power in the market for Class 8 truck transmissions because it had the power to maintain the price of such transmissions at supracompetitive levels profitably, without losing substantial sales.  The market for Class 8 truck transmissions is made up of three principal submarkets: linehaul, vocational, and specialty.  Eaton has monopoly and/or market power in each of these submarkets,  in that it had the power to maintain the price for each category of these transmissions at supracompetitive levels.  Linehaul, vocational, and specialty transmissions are not viable substitutes for each other.

115.    In response to a small but significant, other-than-temporary increase in price from a competitive level, substitution by purchasers of Class 8 truck transmissions to other products would not be significant. Likewise, in response to a small but significant, other-than-temporary increase in price from a competitive level, (a) substitution by purchasers of Class 8 linehaul transmissions to other products, including Class 8 vocational and specialty

transmissions, would not be significant; and (b) substitution by purchasers of Class 8 vocational transmissions to other products, including Class 8 linehaul and specialty transmissions, would not be significant.

116.    Class 8 truck transmissions do not exhibit significant, positive cross-elasticity of demand with respect to price with other products.   Likewise, Class 8 linehaul truck transmissions do not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than Class 8 linehaul truck transmissions, and Class 8 vocational transmissions do not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than Class 8 vocational transmissions.

117.    Because of the unique characteristics and specific applications for Class 8 truck transmissions, Class 8 truck transmissions are differentiated from all other products.  Likewise, because of their differing characteristics and applications, Class 8 linehaul transmissions, are differentiated from all other products, including Class 8 vocational and specialty transmissions.

118.    Control of the market for Class 8 truck transmissions was all that was needed to maintain the price of Class 8 truck transmissions prices and profitability at supracompetitive levels.  Likewise, control of the market for Class 8 linehaul transmissions was all that was needed to maintain the price and profitability of Class 8 linehaul transmissions at supracompetitive levels.

119.    Defendants sold Class 8 truck transmissions, including linehaul transmissions, at prices well in excess of marginal costs and competitive prices and enjoyed healthy profit margins.

120.    Defendants had, and exercised, the power to exclude competition for Class 8 truck transmissions, including linehaul transmissions.

121.    There were, at all relevant times,  high barriers to entry with respect to Class 8 truck transmissions, including linehaul transmissions.

122.    To the extent that defining a relevant product market is necessary in this case, the relevant product market is Class 8 truck transmissions.  And to the extent that defining relevant product submarkets is necessary in this case, the relevant product submarkets are Class 8:(a) linehaul transmissions; (b) vocational transmissions; and (c) specialty transmissions. Plaintiff, on its own behalf and on behalf the Class, is seeking redress for the harm caused by Defendants' restraint of trade, monopolization and exclusionary conduct in the market for linehaul transmissions.

123.    The geographic market for Class 8 truck transmissions is the United States and its territories (for purposes of this paragraph referred to as "U.S.").  Because of the assorted applications for which U.S. Class 8 trucks are used, the wide assortment of U.S. truck configurations, the extensive network of highways and expressways in the U.S, along with load restrictions in other regions of the world compared to the U.S. (meaning that Class 8 vehicles in the U.S. tend to be heavier and longer and transmissions therefore tend to be larger), and other factors, transmissions used in Class 8 vehicles in the U.S. are different from transmissions used in Class 8 vehicles in other regions of the world.  Suppliers of U.S. Class 8 truck transmissions are likely to locate their primary manufacturing and assembly facilities, and marketing, distribution, and service personnel in the U.S.  As such, heavy duty truck purchasers cannot practicably turn to other regions of the world for transmissions to use in U.S. Class 8 vehicles.

124.    At all relevant times, Eaton, through the other Defendants, held at least a 90% share in the relevant product market, and the relevant product submarkets, in the U. S.

## CAUSES OF ACTION

**Count I: Monopolization of the Linehaul Market in Violation of Section 2 of the
Sherman Act, 15 U.S.C. §2 (against Eaton)**

125.   Plaintiff incorporates by reference paragraphs 1 through 124.

126.   Class 8 truck transmissions constitute a relevant product market, and linehaul transmissions constitute a relevant product submarket. The United States is the relevant geographic market.

127.   Eaton possessed, and currently possesses, monopoly power in the markets for Class 8 truck transmissions and linehaul transmissions.  Barriers to entry and expansion by existing (and new) firms are high in these markets.  Eaton, with approximately 90% share of these markets, has the power to control price and exclude competition for transmissions in these markets.

128.   Eaton, with and through the OEMs, willfully and wrongfully maintained and/or extended its monopoly in these markets by engaging in the exclusionary, anticompetitive conduct set forth in the preceding paragraphs of this Complaint.

129.   The anticompetitive effects of Eaton's (and the OEMs') conduct far outweigh any purported procompetitive justifications.

130.   As a direct, foreseeable, and proximate result of Eaton's (and the OEMs') exclusionary, anticompetitive conduct, Plaintiff and the Class have been harmed and competition has been impaired by, without limitation, depriving Plaintiff and the Class of fair and timely access to innovative linehaul transmission technology and lower prices for linehaul transmissions.

131.    As a result of Eaton's (and the OEMs') exclusionary and anticompetitive conduct, Plaintiff and members of the Class paid artificially inflated prices for Class 8 linehaul transmissions throughout the Class Period.

132.    Plaintiff and members of the Class have been injured in their business or property by Eaton's antitrust violations.  Their injury consists of having paid higher prices for Class 8 linehaul truck transmissions than they would have paid in the absence of the violations. Such injury, called "overcharges," is of the type antitrust laws were designed to prevent, flows from that which makes Eaton's conduct unlawful, and Plaintiff and the Class are proper entities to bring a case concerning this conduct.

## Count II: Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act, 15 U.S.C. §2 (against Eaton and the OEMs)

133.    Plaintiff incorporates by reference paragraphs 1 through 124.

134.    Through their agreements, Eaton and the OEMs conspired to maintain and enhance Eaton's monopoly power in the relevant market for Class 8 truck transmissions, and the relevant submarkets, including the market for Class 8 linehaul transmissions.

135.    Eaton and the OEMs specifically intended that their agreements would maintain Eaton's monopoly in the relevant market and the relevant submarkets, and injure Plaintiff and the Class.

136.     Eaton and the OEMs each committed at least one overt act in furtherance of their conspiracy.

137.    As a result of this unlawful conspiracy to monopolize, Plaintiff and members of the Class paid artificially inflated prices for Class 8 linehaul transmissions.

138.    Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations.  Their injury includes having paid higher prices for

Class 8 linehaul truck transmissions than they would have paid in the absence of the violations. Such injury, called "overcharges," is of the type antitrust laws were designed to prevent, flows from that which makes Defendants' conduct unlawful, and Plaintiff and the Class are proper entities to bring a case concerning this conduct.

139.    The anticompetitive effects of Defendants' conduct far outweigh any purported procompetitive justifications.

**Count III: Use of Exclusionary Contracts to Substantially Lessen Competition in Violation of Section 3 of the Clayton Act, 15 U.S.C. §14 (against Eaton and the OEMs)**

140.    Plaintiff incorporates by reference paragraphs 1 through 124.

141.    Eaton and the OEMs entered into contracts (the LTAs) for the purchase of goods (including vocational and linehaul transmissions) that, by their agreed-upon terms, extended duration, and cumulative practical effect, prevented the OEMs from purchasing Meritor's and ZF Meritor's transmissions.

142.    The OEMs purchased transmissions from Eaton, consistent with their respective exclusionary contracts with Eaton, which excluded Meritor and ZF Meritor from 90% or more of the sales opportunities for Class 8 truck transmissions, and substantially lessened competition and/or maintained Eaton's monopoly in, *inter alia*, the Class 8 truck transmissions and linehaul markets in the United States.

143.    The anticompetitive effects of Eaton's exclusionary contracts with the OEMs far outweigh any purported procompetitive justifications.

144.    As a direct, foreseeable, and proximate result of Eaton's exclusionary, anticompetitive contracts with the OEMs, Eaton and the OEMs have harmed Plaintiff, the Class, and competition by, without limitation, depriving Plaintiff and the Class of fair and timely access to innovative Class 8 truck transmission technology and lower prices for those

transmissions.  Such contracts caused Plaintiff and the Class to pay more for Class 8 linehaul transmissions than they would have paid absent these contracts.

### Count IV: Use of Exclusionary Contracts and Other Conduct in Violation of Section 1 of the Sherman Act, 15 U.S.C. §1 (against Eaton and the OEMs)

145.    Plaintiff incorporates by reference paragraphs 1 through 124.

146.    To the extent that a relevant market needs to be defined in connection with this Count, the relevant product market and submarkets are as alleged in Paragraphs 114-124 above.

147.    Eaton and the OEMs combined, conspired, and contracted among themselves to restrain trade, and competition from Meritor and ZF Meritor, in the relevant markets and submarkets, including the Class 8 linehaul transmissions market, in violation of 15 U.S.C. §1.

148.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations.  They have been injured by having to pay higher prices for Class 8 linehaul transmissions in the United States.  Such injury is of the type the antitrust laws were designed to prevent and flows from Defendants' unlawful conduct.

### JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on its own behalf and on behalf of the Class, demands a trial by jury of all claims asserted in this Complaint so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests entry of judgment:

(a)    Certifying that this action may be maintained as a class action under Rule 23(b)(2)-(3) of the Federal Rules of Civil Procedure, appointing Plaintiff as a Class representative, and appointing Plaintiff's counsel as lead Class counsel;

(b)     Directing that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

(c)     Awarding Plaintiff and the Class their full monetary damages to be proven at trial;

(d)     Awarding Plaintiff and the Class treble their monetary damages, pursuant to 15 U.S.C. §15;

(e)     Awarding Plaintiff and the Class pre- and post-judgment interest on their damages;

(f)     Awarding Plaintiff and the Class the costs of this action and reasonable attorneys' fees pursuant to 15 U .S .C. §15; and

(g)     Awarding Plaintiff and the Class such other and further relief as the Court deems just and proper.


Dated:  March 31, 2010                         Respectfully Submitted,

                                               ROSENTHAL, MONHAIT & GODDESS, P.A.

                                               */s/ P. Bradford deLeeuw*
                                               Jeffrey S. Goddess (Del. Bar No. 630)
                                               Jessica Zeldin (Del. Bar No. 3558)
                                               P. Bradford deLeeuw (Del. Bar No. 3569)
                                               919 N. Market Street, Suite 1401
                                               P.O. Box 1070
                                               Wilmington, DE  19899
                                               (302) 656-4433
                                               jgoddess@rmgglaw.com
                                               jzeldin@rmgglaw.com
                                               braddeleeuw@rmgglaw.com


                                               *Attorneys for Plaintiff*

**OF COUNSEL**

**BERMAN DeVALERIO**
Manuel J.  Dominguez (FBN 0054798)
Marc J.  Greenspon (FBN 0604593)
Kyle G.  DeValerio (FBN 0018565)
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Telephone: (561) 835-9400
Facsimile:  (561) 835-0322 mdominguez@bermandevalerio.com
mgreenspon@bermandevalerio.com
kdevalerio@bermandevalerio.com