IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARK S. WALLACH, AS CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF PERFORMANCE TRANSPORTATION SERVICES, INC., and TAURO BROTHERS TRUCKING COMPANY, jointly and on behalf of the estate and all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>EATON CORPORATION, DAIMLER TRUCKS NORTH AMERICA LLC, NAVISTAR INTERNATIONAL CORPORATION, INTERNATIONAL TRUCK AND ENGINE CORPORATION, PACCAR INC., KENWORTH TRUCK COMPANY, PETERBILT MOTORS COMPANY, VOLVO TRUCKS NORTH AMERICA and MACK TRUCKS, INC.,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civ. No. 10-260-SLR<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Jeffrey S. Goddess, Esq., Jessica Zeldin, Esq. and P. Bradford deLeeuw, Esq. of Rosenthal, Monhait & Goddess, P.A. Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Manuel J. Dominquez, Esq., Marc J. Greenspon, Esq., Kyle G. DeValerio, Esq. of Berman DeValerio; Richard A. Koffman, Esq., Benjamin D. Brown, Esq. and Emmy L. Levens, Esq. of Cohen, Milstein, Sellers & Toll PLLC.; Barry S. Taus, Esq. and Brett Cebulash, Esq. of Taus, Cebulash & Landau LLP; Peter Kohn, Esq. of Faruqi & Faruqi LLP; Vincent J. Esades, Esq. of Heins, Mills & Olson PLC; Robert G. Eisler, Esq. of Grant & Eisenhofer, PA; Geoffrey C. Jarvis, Esq. of Grant & Eisenhofer, PA; and Scott W. Carlson, Esq. and Vincent J. Esades, Esq. of Heins, Mills & Olson, PLC.

Donald E. Reid, Esq., of Morris Nichols, Arsht & Tunnell, Wilmington, Delaware. Counsel for Defendant Eaton Corporation. Of Counsel: Joseph A. Ostoyich, Esq. and William C. Lavery, Esq. of Baker Botts, LLP.

Richard L. Horwitz, Esq. of Potter, Anderson & Corroon, LLP, Wilmington, Delaware. Counsel for Defendants Daimler Trucks North America LLC and Freightliner LLC. Of

Counsel: Daniel L. Goldberg, Esq., Gregory F. Wells, Esq. and Daniel S. Savrin, Esq. of Bingham McCutchen, LLP.

Kelly E. Farnan, Esq. of Richards, Layton & Finger, PA, Wilmington, Delaware. Counsel for Defendant Navistar International Corporation. Of Counsel: Andrew Paul Bautista, Esq., Daniel E. Laytin, Esq., James H. Mutchnik, Esq. and Leslie S. Garthwaite, Esq., of Kirkland & Ellis, LLP.

Kelly E. Farnan, Esq. of Richards, Layton & Finger, PA, Wilmington, Delaware. Counsel for Defendant International Truck and Engine Corporation. Of Counsel: Leslie S. Garthwaite, Esq., of Kirkland & Ellis, LLP.

Francis DiGiovanni, Esq. and Dana Kathryn Severance, Esq. of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware. Counsel for Defendant Paccar, Inc.

Francis DiGiovanni, Esq. and Dana Kathryn Severance, Esq. of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware. Counsel for Defendant Kenworth Truck. Of Counsel: Carrie M. Anderson, Esq., James, C. Egan, Jr., Esq. and Richard R. Cook, Esq. of Weil, Gotshal & Manges, LLP.

Francis DiGiovanni, Esq. and Dana Kathryn Severance, Esq. of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware. Counsel for Defendant Peterbilt Motors Company.

M. Duncan Grant, Esq. of Pepper Hamilton LLP, Wilmington, Delaware. Counsel for Defendant Volvo Trucks North America.

M. Duncan Grant, Esq., Daniel J. Boland, Esq. and Jeremy Heep, Esq. of Pepper Hamilton LLP, Wilmington, Delaware. Counsel for Defendant Mack Trucks Inc.

---

## MEMORANDUM OPINION

Dated: September 30, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On March 31, 2010, plaintiffs Mark S. Wallach, as Chapter 7 Trustee for the

Bankruptcy Estate of Performance Transportation Services, Inc. ("PTS"), and Tauro

Brothers Trucking Company ("Tauro Brothers") (collectively, "plaintiffs") filed an antitrust

class action complaint against various defendants.  (D.I. 1)  Defendants to this action

include Eaton Corporation ("Eaton"), Daimler Trucks North America LLC,  Freightliner

LLC, Navistar International Corporation, International Truck and Engine Corporation,

Paccar, Inc., Kenworth Truck Company, Peterbilt Motors Company, Volvo Trucks North

America and Mack Trucks, Inc. (collectively, "defendants").  By agreement of the

parties, plaintiffs filed an amended complaint on July 16, 2010.  (D.I. 25)  The amended

complaint asserts the following counts:  (1) conspiracy to monopolize in violation of

Section 2 of the Sherman Act, 15 U.S.C. § 2 (against all defendants); (2) use of

exclusionary contracts to substantially lessen competition in violation of Section 3 of the

Clayton Act, 15 U.S.C. § 14 (against all defendants); (3) use of exclusionary contracts

and other conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (against

all defendants); and (4) monopolization of the Class 8 transmissions market in violation

of Section 2 of the Sherman Act, 15 U.S.C. § 2 (against Eaton only).  (*Id.*)  In lieu of

answering the complaint, defendants filed motions to dismiss under Federal Rule of

Civil Procedure 12(b)(6); Eaton filed its own motion to dismiss (D.I. 34) and the

remaining defendants filed a collective motion. (D.I. 36)

The court has jurisdiction to hear this case under 28 U.S.C. § 1331, 28 U.S.C. §

1337(a) and 15 U.S.C. § 15.  For the following reasons, the court grants in part and

denies in part.

## II. BACKGROUND

### A. The Parties

Plaintiffs are trucking companies. Prior to seeking bankruptcy protection in November of 2007, PTS was in the business of transporting newly assembled vehicles from manufacturing facilities to retail dealerships. (D.I. 25 at ¶ 17) PTS delivered new vehicles using a fleet of Class 8 trucks. (*Id.*) PTS alleges that it purchased Class 8 vehicles from one or more of the defendants. (*Id.*) Tauro Brothers is also a trucking company and is the assignee of certain claims from R&R, Inc., which purchased Class 8 trucks from one or more defendants. (*Id.* at ¶ 18)

Defendants are involved in the manufacture and sale of Class 8 trucks. Eaton manufactures transmissions for Class 8 trucks. (*Id.* at ¶ 19) The remaining defendants (Daimler Trucks North America LLC, Freightliner LLC, Navistar International Corporation, International Truck and Engine Corporation, Paccar, Inc., Kenworth Truck Company, Peterbilt Motors Company, Volvo Trucks North America and Mack Trucks, Inc.), referred to as Original Equipment Manufacturers ("OEMs"), manufacture and sell Class 8 trucks. (*Id.* at ¶¶ 20-27) In order to assemble and sell Class 8 trucks, OEMs purchase component parts, such as transmissions, from suppliers, such as Eaton. (*Id.* at ¶ 39)

### B. Class 8 Trucks and Transmissions

There are eight recognized classes of vehicles, with Class 8 trucks being the heaviest. (*Id.* at ¶ 32) Examples of Class 8 heavy duty trucks include the fire truck,

2

garbage truck, and long-distance freighter. (*Id.* at ¶¶ 36-38) The purchase of Class 8 trucks is unique in the sense that buyers can essentially build a truck to their desired specifications. (*Id.* at ¶ 4) When purchasing a Class 8 truck, buyers can consult OEM "databooks," which list an OEM's standard and non-standard component offerings,[1] and designate the specific components they desire in their trucks. (*Id.* at ¶¶ 40-41) Since manufacturers of component parts in the Class 8 truck industry market products directly to potential customers, it is not uncommon for buyers to select non-standard options from a databook. (*Id.*)

### C. Plaintiffs' Allegations

Plaintiffs contend that Eaton has been the dominant and most widely recognized American manufacturer of Class 8 transmissions, holding a near monopoly in the market since the 1950s. (*Id.* at ¶¶ 45-48) In the 1990s, ZF Meritor established itself as a viable competitor to Eaton, producing desirable, competitive and innovative transmissions. (*Id.* at ¶¶ 55-68) In response to this competition from ZF Meritor and a significant downturn in the Class 8 truck market which occurred in late 1999-early 2000, plaintiffs allege that Eaton and the OEMs conspired to put ZF Meritor out of business, thereby expanding Eaton's monopoly and permitting all defendants to share in the profits resulting from this monopoly. (*Id.* at ¶ 69)

This conspiracy was allegedly achieved by Eaton entering into Long Term

---

[1] A databook is a term of art used in the trucking industry. It represents the truck broken down to its core components and provides customers with standard and non-standard component options. (D.I. 25 at ¶¶ 4; 41) A transmission is an example of a component part that exists in a databook. (*Id.*)

Agreements ("LTAs") in the early 2000s with each of the four OEMs.[2] (*Id.* at ¶ 75).

While each Eaton-OEM LTA was separately negotiated and thus distinct, the LTAs

shared a similar purpose and features. (*Id.* at ¶¶ 85-128) Each LTA contained a

provision whereby the OEMs would receive sizable and lucrative rebates from Eaton

assuming the OEMs utilized a certain percentage of Eaton transmissions annually. (*Id.*)

For example, under the Freightliner-Eaton LTA, Freightliner was required to purchase

92% of its Class 8 transmission needs from Eaton in order to receive the specified

rebates. (*Id.* at ¶ 88) Aside from tying percentage requirements to rebates, the LTAs

included other provisions designed to minimize ZF Meritor's market share. Examples of

these provisions include eliminating ZF Meritor transmissions from databooks or

removing them from the standard position, refusing to provide warranties on trucks with

ZF Meritor transmissions, overcharging for ZF Meritor transmissions and refusing to

provide financing on vehicles with ZF Meritor transmissions. (*Id.* at ¶¶ 85-129) In

essence, plaintiffs argue that the LTAs were defacto exclusive dealing contracts (*id.* at ¶

10) and the OEMs all agreed with each other to enter into these agreements in order to

eliminate ZF Meritor and share in the profits of Eaton's monopoly. (*Id.* at ¶ 2) In the

end, plaintiffs allege that defendants' conspiracy was successful as the LTAs greatly

diminished ZF Meritor's market share in the Class 8 transmission field and left it no

opportunity for growth. (*Id.* at ¶¶ 132-135) In the face of these economic realities, ZF

Meritor's market share declined to an insignificant level. (*Id.*) Plaintiffs ultimately

contend that they had to pay higher prices for transmissions and, in turn, for Class 8

---

[2] A series of mergers in the mid-1990's reduced to four the number of OEMs
purchasing Class 8 transmissions. (D.I. 25 at ¶ 51).

4

trucks, as a result of defendants' actions; they also assert that "they had less choice and suffered from a decrease in innovation." (*Id.* at ¶ 12)

## III. STANDARD

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (interpreting Fed.R.Civ.P. 8(a)) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 545 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* Furthermore, "[w]hen there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, ___ U.S. ___, 129

S.Ct. 1937, 1950 (2009). Such a determination is a context-specific task requiring the
court "to draw on its judicial experience and common sense." *Id.*

## IV. DISCUSSION

Defendants have set forth a variety of arguments in support of their motions to
dismiss. The overarching claims that would result in the dismissal of all counts are
addressed before count-specific arguments.

### A. *Illinois Brick's* Indirect Purchaser Rule

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977), the United States
Supreme Court "established the general rule that only direct purchasers from antitrust
violators may recover damages in antitrust suits." *Howard Hess Dental Labs. Inc. v.
Dentsply Int'l, Inc.*, 424 F.3d 363, 369 (3rd Cir. 2005) ("*Hess I*"). Indirect purchasers are
generally not entitled to recover damages for passed-on overcharges. *Id.* This is
referred to as the "indirect purchaser rule." Three policy reasons justified the Court's
decision to impose this rule: "(1) a risk of duplicative liability for defendants and
potentially inconsistent adjudications could arise if courts permitted both direct and
indirect purchasers to sue defendants for the same overcharge; (2) the evidentiary
complexities and uncertainties involved in ascertaining the portion of the overcharge
that the direct purchasers had passed on to the various levels of indirect purchasers
would place too great a burden on the courts; and (3) permitting direct and indirect
purchasers to sue only for the amount of the overcharge they themselves absorbed and
did not pass on would cause inefficient enforcement of the antitrust laws by diluting the
ultimate recovery and thus decreasing the direct purchasers' incentive to sue." *Id.* at

6

369-70. Since plaintiffs admit to indirectly purchasing Eaton transmissions through the OEMs (as a component part of the Class 8 trucks) (D.I. 44 at ¶ II.A), defendants contend that plaintiffs cannot recover based upon the *Illinois Brick* indirect purchaser rule. (D.I. 35 at ¶ 1; D.I. 37 ¶ V)

Plaintiffs argue that a general co-conspirator exception to the *Illinois Brick* indirect purchaser rule exists and they fall within that exception. (D.I. 44 at ¶ II.A) The Third Circuit addressed the applicability of the general co-conspirator exception in *Hess I*. According to *Hess I*, a general co-conspirator exception would only exist, if at all, where the "middlemen would be barred from bringing a claim against their former co-conspirator . . . because their involvement in the conspiracy was 'truly complete' (*i.e.*, if the middlemen would be barred from suing by the 'complete involvement defense')." *Hess I*, 424 F.3d at 379. While the *Hess I* Court left some question as to the actual existence of the exception - based upon its failure to apply the exception to the facts of the case and its acknowledgment that the Third Circuit had yet to address whether a complete involvement defense existed in an antitrust action, *see generally*, *Hess I*, 424 F.3d at 376-84 - the Court appears to have subsequently affirmed the potential applicability of the general coconspirator exception. *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 259 (3rd Cir. 2010) ("*Hess II*") ("As we explained in *Hess I*, the Plaintiffs could come within *Illinois Brick's* coconspirator exception only if the Dealers were precluded from asserting claims against Dentsply because their participation in the conspiracy was 'truly complete.'").

Because the exception is viable in the Third Circuit, the court next examines the

7

circumstances in which a complete involvement defense would apply.  Since the Third

Circuit has yet to set forth the exact contours of a complete involvement defense, the

court will look for guidance elsewhere.  In *Perma Life Mufflers, Inc.  v. International

Parts Corp.*, 392 U.S. 134 (1968), the United States Supreme Court was presented with

the question of whether a plaintiff in an antitrust action was "barred from recovery by a

doctrine known by the Latin phrase in pari delicto, which literally means 'of equal fault.'"[3]

392 U.S. at 135.  In *Perma Life*, the plaintiffs operated Midas Mufflers shops under

franchise agreements granted by Midas.  *Id.*  The agreements restricted the dealers in

several ways.  *Id.* at 137.  For example, the dealers were required to purchase muffler

and exhaust systems from Midas and could not buy supplies from Midas competitors.

*Id.*  Plaintiffs had requested that Midas eliminate these restrictions, but Midas refused

and threatened to, and did, terminate the agreements for failure to comply.  *Id.*

Plaintiffs brought suit under the Sherman and Clayton Acts, alleging the restrictive

provisions in the franchise agreements were illegal restraints of trade.  *Id.*

> The Seventh Circuit, affirming the district court,

> held the suit barred because petitioners were in pari delicto. The court noted
> that each of the petitioners had enthusiastically sought to acquire a Midas
> franchise with full knowledge of these provisions and had 'solemnly
> subscribed' to the agreement containing the restrictive terms. Petitioners had
> all made enormous profits as Midas dealers, had eagerly sought to acquire
> additional franchises, and had voluntarily entered into additional franchise

---

[3] "[This] common-law defense . . . derives from the Latin, *in pari delicto potior
est conditio defendentis:* 'In a case of equal or mutual fault ... the position of the
[defending] party ... is the better one.'  The defense is grounded on two premises: first,
that courts should not lend their good offices to mediating disputes among wrongdoers;
and second, that denying judicial relief to an admitted wrongdoer is an effective means
of deterring illegality."  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306
(1985).

8

> agreements, all while fully aware of the restrictions they now challenge.
> Under these circumstances, the Court of Appeals concluded, '(i)t would be
> difficult to visualize a case more appropriate for the application of the pari
> delicto doctrine.'

*Id.* at 138-39.

In reversing the Seventh Circuit, the Supreme Court explained that it "refused to undermine the antitrust acts by denying recovery to an injured party merely because they have participated to the extent of utilizing illegal arrangements formulated and carried out by others." *Id.* at 139. The Supreme Court noted that the plaintiffs' participation "was not voluntary in any meaningful sense;" while plaintiffs sought the franchises enthusiastically, they did continually object to the inclusion of certain restrictions and only accepted them because it was necessary in order to obtain attractive business opportunities. *Id.* Based upon the facts of the case, the Supreme Court went on to hold that the doctrine of in pari delicto should not be recognized as a defense in antitrust actions. *Id.* at 140. Importantly, however, the Supreme Court expressly refused to decide the question of whether "truly complete involvement and participation in a monopolistic scheme" could ever be a basis for barring a plaintiff's antitrust cause of action. *Id.* Based upon the facts in the case, truly complete involvement was not present; the Supreme Court noted that the "illegal scheme was thrust upon" the dealers by Midas. *Id.* at 141. According to the Court, "once it is shown that the plaintiff did not aggressively support and further the monopolistic scheme as a necessary part and parcel of it, his understandable attempts to make the best of a bad situation should not be a ground for completely denying him the right to recover which the antitrust acts give him." *Id.* at 140. Thus, under *Perma Life*, it is apparent that a

9

complete involvement defense would not be applicable where involvement in an illegal scheme is not voluntary or is coerced.

The Supreme Court had occasion to reexamine the complete involvement defense in *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985). In *Bateman Eichler*, the Supreme Court addressed the applicability of the in pari delicto defense in the context of a securities lawsuit. After analyzing the *Perma Life* decision, the Court concluded that a complete involvement defense does exist and could bar suit. *Id.* at 310-11. According to the Court, a plaintiff may be barred from recovering where "(1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress and (2) preclusion of the suit would not significantly interfere with the effective enforcement of the securities laws." *Id.*

As mentioned previously, the Third Circuit has not had occasion to apply the complete involvement defense; while the circuit courts that have addressed the applicability of the complete involvement defense do not completely agree on what is required of a plaintiff alleging this defense, they generally agree that "complete, voluntary and substantially equal participation in an illegal practice" must be shown. *See Sullivan v. National Football League*, 34 F.3d 1091, 1107 (1st Cir. 1994) (analyzing and summarizing complete involvement defense caselaw).[4]

---

[4] Since the *Bateman Eichler* decision, courts have also noted that the second prong in that test would be applicable to antitrust laws; in other words, along with the substantially equal involvement prong, preclusion of suit cannot significantly interfere with the enforcement of antitrust laws. *Id.* at 1108, n.7. Since no argument has been made on, and the court sees no reason why preclusion of suit by the OEMs would significantly interfere with the enforcement of antitrust laws, this issue will not be addressed any further.

The court finds *Sullivan v. National Football League*, 34 F.3d 1091 (1st Cir. 1994), to be instructive with respect to the possible applicability of a complete involvement defense. In *Sullivan*, the plaintiff was an owner of a National Football League ("NFL") football team who sought to raise capital by making a public offering of 49% of his team. *Id.* at 1095. The NFL, however, had a policy that forbade public ownership of teams. *Id.* The plaintiff eventually sued the NFL claiming, among other things, that the NFL violated the Sherman Act by preventing him from making his public offering. *Id.* at 1096. A jury rendered a verdict for the plaintiff. *Id.* Throughout the suit, the NFL contended that plaintiff's suit should be barred by the complete involvement defense. *Id.* at 1107. The NFL requested an instruction on the defense, but the trial court refused to give it. *Id.* On appeal, the First Circuit found this to be prejudicial error warranting a new trial. *Id.* at 1109. According to the First Circuit, there was sufficient evidence in the record to conclude that plaintiff bore "substantially equal responsibility for the NFL's public ownership policy because Sullivan helped adopt the policy, he relied upon it and he actively supported it." *Id.* at 1108. The evidence indicated plaintiff was a member of the committee that established ownership policies and he relied on and supported those policies when he purchased all outstanding shares of his team (after the NFL policy was enacted). *Id.* There was also no evidence that plaintiff ever opposed or objected to the ownership policy prior the circumstances prompting his lawsuit. *Id.*

With the above in mind, the court now looks to the facts of the present dispute and concludes that plaintiffs have sufficiently pled facts to suggest that defendant

11

middlemens' (here the OEMs) involvement in the conspiracy[5] was truly complete, i.e., the middlemen could be barred from suit by the complete involvement defense. The facts of the present case are much more akin to those in *Sullivan* and are distinguishable from the coercion present in *Perma Life*; put differently, it appears the OEMs are parties that actively participated in the formulation and encouraged the continuation of an illegal scheme in substantially equal part with Eaton. Far from being coerced, the complaint explains that the OEMs approached Eaton and suggested they enter into mutually beneficial partnership agreements. (D.I. 25 at ¶¶ 72-74) The complaint alleges that the OEMs engaged in arms length negotiations with Eaton to produce mutually beneficial LTAs, whereby the OEMs would receive sizeable rebates for meeting penetration goals and Eaton would see ZF Meritor's market share significantly diminished. (*Id.* at ¶¶ 69-141) The OEMs encouraged the continuation of the conspiracy or, in other words, actively supported and furthered the conspiracy by meeting their percentage targets (*id.* at ¶¶ 76-77) and amending and extending their LTAs. (*Id.* at ¶ 87(Freightliner);¶ 108 (International); ¶ 116 (PACCAR); ¶ 124 (Volvo/Mack)) Finally, there are no allegations that suggest that either Eaton or the OEMs did substantially more than the other to maintain or further the conspiracy; instead, the allegations suggest that each party needed to fully participate in order for the conspiracy to succeed.

## B. Statute of Limitations

---

[5] The actual existence of the conspiracy, while assumed here, is addressed *infra* in section D.1. As discussed *supra* in section II.C, the plaintiffs allege that the OEMs all agreed to collectively sign LTAs with Eaton that were designed to eliminate ZF Meritor from the Class 8 transmission market.

Defendant Eaton contends, based upon plaintiffs' failure to plead the existence

of a specific truck purchase within the four years prior to the filing of the complaint, that

plaintiff's claims are time-barred by the four year statute of limitations applicable to

antitrust cases. (D.I. 35 at ¶ III) Instead of listing, in the complaint, specific purchases

and the dates on which those purchases occurred, plaintiffs generally allege that they

purchased one or more trucks from one or more of the defendants during the eight year

class period asserted. (D.I. 25 at ¶¶ 17-18)

Contrary to defendant's position, plaintiffs are not required to plead sufficient

facts so as to avoid an affirmative defense. As the Third Circuit explained in *Bethel v.*

*Jendoco Construction Corp.*, 570 F.2d 1168 (3rd Cir. 1978):

> Under Fed.R.Civ.P. 8(c), the statute of limitations constitutes an affirmative
> defense to an action. Under the law of this and other circuits, however, the
> limitations defense may be raised on a motion under Rule 12(b)(6), but only
> if the time alleged in the statement of a claim shows that the cause of action
> has not been brought within the statute of limitations. If the bar is not
> apparent on the face of the complaint, then it may not afford the basis for
> dismissal of the complaint under Rule 12(b)(6).

*Id.* at 1174 (citations and quotations omitted). Since plaintiffs' generalized allegations

regarding purchase do not necessarily place them outside of the applicable four year

statute of limitations, the court does not find plaintiffs' claims time-barred at this stage of

the proceedings.[6]

## C. Antitrust Injury

---

[6] Defendant Eaton also argues that plaintiffs' time-barred claims cannot be
saved by plaintiffs' allegations of fraudulent concealment. (D.I. 35 at ¶ III) According to
Eaton, plaintiffs have insufficiently pled an allegation of fraudulent concealment. (*Id.*)
Because the court does not find plaintiffs' claims to be time-barred, the court will not
address defendant's fraudulent concealment argument.

13

To establish antitrust injury, a plaintiff must show: (1) harm of the type the antitrust laws were intended to prevent and (2) an injury to the plaintiff that flows from that which makes the defendant's acts unlawful. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977); *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3rd Cir. 2010). Failure to properly plead antitrust injury will result in plaintiffs lacking the requisite standing to sue. *Gulfstream II Associates, Inc. v. Gulfsteam Areospace Corp.*, 995 F.2d 425, 429 (3rd Cir. 1993).

Prong one of the above test can be satisfied by pleading any one of several types of harm. A "decrease in competition" is one type of harm the antitrust laws were intended to prevent. *Gulfstream*, 995 F.2d at 429. Another is the payment of higher consumer prices as a result of monopolistic activity or anticompetitive conduct. *Harrison Aire, Inc. v. Aerostar Int'l Inc.*, 423 F.3d 374 (3rd Cir. 2005); *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 688 (2nd Cir. 2009). Prong two is generally satisfied by alleging that plaintiff is a "competitor or consumer in the relevant market." *Gulfstream*, 995 F.2d at 429. The second prong can also be satisfied by showing a "'significant causal connection' such that the harm to the plaintiff can be said to be 'inextricably intertwined' with the antitrust conspiracy." *Id.* (quoting *Blue Shield v. McCready*, 457 U.S. 456, 484 (1982)).

In the present case, plaintiffs allege themselves to be consumers[7] of Class 8 transmissions (D.I. 25 at ¶ 17), thereby satisfying prong two, and claim a decrease in

---

[7]  While plaintiffs admittedly receive the transmissions as component parts of the Class 8 trucks they purchase, plaintiffs are consumers in the sense that they can choose which specific type of transmissions they want installed in their trucks.

competition (*id.* at ¶¶ 12, 137), satisfying prong one. Plaintiffs have also alleged, several times and in several different ways, that they paid higher prices for Class 8 transmissions than they would have had to had no conspiracy existed. (D.I.  25 at ¶¶ 3, 12,137)  Defendant Eaton objects to the sufficiency of this latter type of injury.  (D.I. 35 at ¶ II.A)  Eaton argues that plaintiffs' formulaic recitation of an "overcharge" injury falls short of the required pleading standard set forth in *Twombly* and asserts that the alleged injury is not casually connected to the illegal conduct since the OEMs set the ultimate price for the trucks they sell.  (*Id.*)  The court finds these arguments unpersuasive.  First, plaintiffs have set forth more than a formulaic recitation of an alleged overcharge.  For instance, plaintiffs specifically claim that Eaton, after entering into the LTAs, did away with the direct rebates and discounts it used to provide to Class 8 truck purchasers (D.I. 25 at ¶ 138); the complaint also states that Eaton earned record profits after entering into the LTAs.  (*Id.* at ¶ 139).  Second, even if the OEMs set the ultimate price of the trucks, that does not mean plaintiffs did not pay higher prices as a result of the conspiracy.

### D.  Sherman Act Section 1 Claim (Count III)

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust, or conspiracy in restraint of trade."  15 U.S.C. § 1.  However, courts only construe Section 1 to prohibit unreasonable restraints of trade.  *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 99 (3rd Cir. 2010).  To properly plead a Section 1 claim, a plaintiff "must allege four elements:'(1) concerted action by the defendants; [2] that produced anti-competitive effects within the relevant product and

15

geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.'" *Hess II*, 602 F.3d at 253 (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3rd Cir. 2005)). Defendants argue that plaintiffs have failed to adequately plead elements one and four. (D.I. 35 at ¶¶ II.C and II.A; D.I. 37 at ¶ I)

## 1. Agreement

"To prevail on a Section 1 claim . . . a plaintiff must establish the existence of an agreement, sometimes referred to as a 'conspiracy' or 'concerted action.'" *West Penn Allegheny*, 627 F.3d at 99 (citing *Twombly*, 550 U.S. at 553). An agreement is said to exist when "there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *Id.* "A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two," but allegations of direct evidence, that are adequately detailed, are sufficient alone. *Id.* When alleging the existence of an agreement based on circumstantial evidence, a plaintiff may not plead mere parallel conduct or conclusory allegations of agreement. *Twombly*, 550 U.S. at 556-57. Instead, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. To place them in such a context, courts have required the pleading of certain "plus factors." *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 323 (3rd Cir. 2010). While there is no finite set of plus factors, one recognized, and important, plus factor is parallel action that is contrary to self

16

interest. *Id.* at 321-23. Ultimately, however, plus factors are simply circumstances in which the inference of independent action is less likely than that of concerted action. *Id.* at 323.

In the present case, plaintiffs have alleged the existence of a single rimmed hub-and-spoke conspiracy, in which Eaton individually agreed to work with each OEM and the OEMs in turn agreed to work together.[8]  Defendants contend that the existence of such a conspiracy has not been sufficiently pled because the plaintiffs have not alleged anything more than parallel conduct by the OEMs.  (D.I. 35 at ¶ II.C; D.I. 37 at ¶ I.B) Contrary to defendants' assertions, the court finds that sufficient parallel conduct and plus factors have been set forth in the amended complaint.  The complaint details that, between 2000 and 2002, Eaton and each OEM negotiated and put into place similar LTAs that provided for lucrative rebates in exchange for meeting shared penetration goals; the LTAs also contained other provisions that minimized ZF Meritor's market share. *See* section II.C, *supra.*  Aside from this parallel conduct, plaintiffs allege the existence of a plus factor.  Contrary to their self interest, the OEMs' parallel action essentially resulted in the installation of a monopolist (Eaton) in their supply chain and the elimination of a supplier with admittedly desirable products.  As an employee at Freightliner acknowledged, an OEM could gain a competitive advantage over the others by not entering into a restrictive LTA with Eaton and instead working closely with ZF

_____

[8]  While plaintiffs plead the existence of individual Eaton-OEM conspiracies in the alternative and defendants also make arguments premised on the assumption that plaintiffs have failed to plead a rimmed conspiracy, the court will not address these alternative theories and arguments since it finds that a single overarching (rimmed hub-and-spoke) conspiracy has been sufficiently pled.

17

Meritor.  (D.I. 25 at ¶ 79)  But this did not occur, suggesting that the OEMs agreed with each other to enter into the LTAs and eliminate ZF Meritor in exchange for a share in the profits from the resulting monopoly.

### 2. Injury

See section C, *supra*.

### E. Sherman Act Section 2 Claim - Conspiracy to Monopolize (Count I)[9]

Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony."  15 U.S.C. § 2.  To plead a conspiracy to monopolize, a plaintiff must allege:  "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged."  *Hess II*, 602 F.3d at 253. Defendants argue that plaintiffs have failed to adequately plead elements one, three and four.  (D.I. 35 at ¶¶ II.A-C; D.I. 37 at ¶¶ I and III).

### 1. Agreement

See section D.1, *supra*.

---

[9] Count four of plaintiffs' complaint also asserts a claim of monopolization (against Eaton only) in violation of Section 2.  Plaintiffs alleging a claim of monopolization must plead "(1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Race Tires*, 614 F.3d at 75.  As defendant Eaton has made no argument with respect to either of these elements, the court will not address this claim any further.

## 2. Specific Intent

Specific intent is a required element of a conspiracy to monopolize claim. "It means an intent which goes beyond the mere intent to do the act. In other words, the defendant must have intended to achieve an illegal monopoly." *Hess II*, 602 F.3d at 257 (citations and quotations omitted). Specific intent may be shown through direct, i.e., "smoking gun," evidence or can be shown through circumstantial evidence. *Advo v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1199 (3rd Cir. 1995).

While defendants contend that plaintiffs have pled nothing more than boilerplate and conclusory allegations of specific intent, the court disagrees. Plaintiffs have pled the existence of direct evidence of Eaton's intent to monopolize: the complaint quotes Eaton employee John Buck as saying "Eaton's strategy was to kill ZF Meritor's transmission business." (D.I. 25 at ¶ 11) Defendants point to *Hess II* and argue that, while Eaton's intent may be sufficiently pled, the specific intent of the OEMs has not been. In *Hess II*, the Third Circuit refused to find that artificial teeth dealers specifically intended to further the monopolistic ambitions of an artificial teeth manufacturer. According to the *Hess II* Court, "[p]laintiffs allege that Dentsply's pricing policies were unlawful, that the Dealers knew as much, and that they signed on to those policies knowing full well they were unlawful. But that allegation, in its many iterations, is conclusory. There are no facts behind it, so it does not plausibly suggest knowledge of unlawfulness on the Dealers' part." *Hess II*, 602 F.3d at 258. The Court went on to explain that it "could feasibly infer the Dealers' specific intent to further Dentsply's monopolistic ambitions if the Plaintiffs had stated enough factual matter to suggest some coordination among the Dealers, something to suggest that they knew that Dentsply was

19

spearheading an effort to squash its competitors by pressing the Dealers into its service and keeping prices artificially inflated." *Id.*

While defendants maintain that *Hess II* is controlling because plaintiffs have also failed to plead any facts suggesting coordination or knowledge among the OEMs, the court finds that sufficient factual allegations have been made by which the court can infer specific intent. The complaint explains that Dennis Kline, a ZF Meritor Vice President of Sales, met with each and every OEM and was uniformly told by the OEMs that they had accepted deals that were designed to put ZF Meritor out of business. (D.I. 25 at ¶ 81) The complaint goes on to explain that Mr. Kline, after learning that the OEMs were entering into restrictive LTAs with Eaton, approached all the OEMs and tried to dissuade them from bestowing a monopoly upon Eaton. (*Id.*25 at ¶¶ 81-82) Uniformly, the OEMs refused to even consider competitive ZF Meritor counter-proposals. (*Id.*) In short, Mr. Kline's testimony suggests that the OEMs knowingly agreed to take part in a scheme designed to eliminate ZF Meritor from the Class 8 transmission industry and acted in conformity with the scheme even when confronted with attractive counter-offers.

Further, the court notes that specific intent may be inferred from facts suggesting that business conduct is not related to any apparent efficiency or lacks a legitimate business justification. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3rd Cir. 2007). As previously discussed, plaintiffs have alleged facts suggesting that the defendant OEMs acted contrary to their business interests by inserting a monopolist in their supply chain and eliminating a producer of desirable supplies. From these allegations, the court could also infer that the OEMs specifically intended to aid Eaton in

20

its quest for monopoly power.

### 3. Injury

See section C, *supra*.

### F. Clayton Act Claim

Section 3 of the Clayton Act provides, in pertinent part:

> It shall be unlawful for any person . . . to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities . . . for use, consumption, or resale within the United States, . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14. The OEMs assert that plaintiffs' Section 3 Clayton Act claim must fail for two reasons. (D.I. 37 at ¶ IV) First, they argue that Section 3 only prohibits exclusive dealing agreements "that completely bar a purchaser from dealing in the goods of the seller's competitor; they contend that "'[p]artial exclusive-dealing agreements are not actionable." (*Id.*) Second, the OEMs contend that Section 3 applies only to sellers, and not buyers. (*Id.*)

With respect to defendants' first argument, plaintiffs direct the court to *LePage's Inc. v. 3M*, 324 F.3d 141 (3rd Cir. 2003). In *LePage's*, 3M acknowledged "entering into contracts that . . . effectively required dealing virtually exclusively with 3M, which LePage's characterize[d] as defacto exclusive." *Id.* at 107. When 3M attempted to "disclaim as exclusive dealing any arrangement that contained no express exclusivity requirement," the Third Circuit rejected this claim, stating:

21

> [T]he law is to the contrary.  No less an authority than the United States
> Supreme Court has so stated. In *Tampa Elec. Co. v. Nashville Coal Co.,* 365
> U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), a case that dealt with §
> 3 of the Clayton Act rather than § 2 of the Sherman Act, the Court took
> cognizance of arrangements which, albeit not expressly exclusive, effectively
> foreclosed the business of competitors.

*Id.* at 157.  As this is exactly what plaintiffs allege, the court will address this argument

no further.

Defendants' second argument has merit.  According to the Ninth Circuit, "the

language of [Section 3 of the Clayton Act] defines liability in terms of a person who

makes a sale or contracts for sale and nowhere provides liability of the buyer."  *McGuire*

*v. Columbia Broadcasting System, Inc.*, 399 F.2d 902, 906 (9th Cir. 1968); *Genetic*

*Systems Corp. v. Abbott Laboratories*, 691 F.Supp. 407, 414 (D.C.C. 1988)

("Though few courts have ever addressed the issue, plaintiff has not pointed to any

case where a court found a purchaser liable for an exclusive dealing contract, and it

appears from the plain language of the statute, the relevant legislative history, and the

observations of commentators that Section 3 does not impose liability on purchasers for

exclusive dealing contracts.").  Plaintiffs have cited no cases that contradict this

proposition and, for that reason, the court is inclined to dismiss the Clayton Act Section 3

claims against the defendant OEMs.

## V. CONCLUSION

For the foregoing reasons, the court grants the defendant OEMs' motion to

dismiss the Clayton Act claim (count II) made against them.  Defendants' motions are

denied on all other counts.  An appropriate order will issue.

22